IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND ELECTRICAL
INDUSTRY HEALTH FUND, *et al.*,

    *Plaintiffs*,

    v.

MESCO, INC., *et al.*,

    *Defendants*.

Civil Action No. ELH-12-505

## MEMORANDUM OPINION

Eight plaintiffs, including seven multiemployer benefit plans and one labor union, filed

suit against MESCO, Inc. ("MESCO") and Michael E. Sewell & Associates, Inc. ("Sewell" or

"Sewell & Associates"), pursuant to section 502(a)(2) of the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2). They contend that

defendants failed to make required contributions and remittances pursuant to a collective

bargaining agreement and other related agreements.

In particular, plaintiffs allege that MESCO failed to pay contributions due for the months

of October 2007 through July 2011, as well as October 2011 through September 2012, and owes

plaintiffs contributions, liquidated damages, and interest in the amount of $228,810.87. *See* ECF

35, Exh. 1, Affidavit of Administrator Claire M. Kratz, May 24, 2013 ("Kratz Aff.") ¶ 7.[1]

Further, they allege that Sewell failed to pay contributions for the period beginning in January

---

[1] In her Affidavit, Ms. Kratz explains that she serves as Administrator for all eight
plaintiffs and that her "primary responsibility is to oversee the operation and administration of
the Funds and manage collection of contributions and remittances owed to the Plaintiffs pursuant
to the terms of the Collective Bargaining Agreement as well as the Agreements and Declarations
of Trust establishing and governing the Funds and related entities." Kratz Aff. ¶ 1.

2009 and ending in December 2011,[2] and owes plaintiffs contributions, liquidated damages, and interest in the amount of $260,633.92. *Id.* ¶ 8. Plaintiffs also maintain that defendants operated as a single entity, and thus each defendant is jointly and severally liable for all unpaid contributions and associated damages.

Plaintiffs have moved for summary judgment (ECF 35, "Motion" or "Mot."), which defendants oppose (ECF 44).[3] Plaintiffs have also filed a "Motion To Strike The Material

---

[2] Ms. Kratz's Affidavit indicates that the period extends until December 2012. *See* Kratz Aff. ¶ 8. Likewise, plaintiffs' summary judgment memorandum reflects employee benefit contributions purportedly owed by Sewell to plaintiffs, "[b]ased on the payroll audit performed for the months of January, 2009 through December, 2012." ECF 35-1 at 39. The actual audit report pertaining to Sewell, however, states that the relevant time period extends only from January 2009 through December 2011. Mem. Exh. 6. Moreover, in other instances plaintiffs indicate that contributions are sought from Sewell only through December 2011. *See, e.g.*, Complaint ¶¶ 17-32 (claiming contributions owed by Sewell only through 2011). Because the parties agree that Sewell dissolved on December 28, 2011, it appears that references to December 2012 are erroneous. In any event, defendants raise no challenge on that basis to the requested damages.

[3] The Court has reviewed plaintiffs' Motion (ECF 35) as well as the accompanying memorandum (ECF 35-1, "Mem." or "Memorandum"); defendants' opposition (ECF 44, "Opp." or "Opposition"); and plaintiffs' reply (ECF 45, "Reply").

The parties also submitted numerous exhibits. Plaintiffs appended 115 exhibits to their Motion and 17 exhibits to their Reply. The exhibits include, *inter alia*, the Affidavit of Claire M. Kratz, May 24, 2013 (Exhibit 1); the MESCO Letter of Assent (Exhibit 2); the Collective Bargaining Agreement of Local Union No. 24, International Brotherhood of Electrical Workers, AFL-CIO (Exhibit 3); Audit of MESCO, October 2007 - July 2011 (Exhibit 4); Audit of MESCO, October 2011 - September 2012 (Exhibit 5); Audit of Sewell, January 2009 - December 2011 (Exhibit 6); Agreement and Declaration of Trust of the Maryland Electrical Industry Health Fund (Exhibit 7); Agreement and Declaration of Trust of the National Electrical Benefit Fund (Exhibit 8); Agreement and Declaration of Trust of the National Labor Management Cooperation Committee (Exhibit 9); Agreement and Declaration of Trust of the Maryland Electrical Industry Labor Management Cooperation Committee (Exhibit 10); Agreement and Declaration of Trust of the Maryland Electrical Industry Joint Apprenticeship and Training Committee (Exhibit 11); Agreement and Declaration of Trust of the Maryland Electrical Industry Pension Fund (Exhibit 12); Agreement and Declaration of Trust of the Maryland Electrical Industry Severance and Annuity Fund (Exhibit 13); MESCO Articles of Incorporation (Exhibit 14); Sewell Articles of Incorporation (Exhibit 16); Sewell Articles of Dissolution (Exhibit 17); and Deposition of Michael E. Sewell, as representative of Sewell (Exhibit 18).

Change To Deposition Testimony Of James W. Conkel, Jr." (ECF 34, "Motion to Strike"), which defendants also oppose (ECF 36). No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I will grant plaintiffs' summary judgment motion, in part, and deny it in part, and deny as moot the Motion to Strike.

## I. Factual Background[4]

Seven of the eight plaintiffs are multiemployer employee benefit plans (the "Plan Plaintiffs"), as defined in section 3(1) of ERISA, 29 U.S.C. § 1002(1)-(2). The remaining plaintiff is a labor organization.

As to the Plan Plaintiffs, five are multiemployer employee welfare benefit plans, as defined in 29 U.S.C. § 1002(1): Maryland Electrical Industry Health Fund ("Health Fund"); Maryland Electrical Industry Joint Apprenticeship and Training Committee ("JATC"); National Electrical Benefit Fund ("NEBF"); National Labor Management Cooperation Committee ("NLMCC"); and Maryland Electrical Industry Labor Management Cooperation Committee ("MEILMCC"). The two other Plan Plaintiffs are multiemployer employee pension benefit plans, as defined in 29 U.S.C. § 1002(1): Maryland Electrical Industry Pension Fund ("Pension Fund") and Maryland Electrical Industry Severance and Annuity Fund ("Severance Fund"). The remaining plaintiff is Local Union No. 24, International Brotherhood of Electrical Workers, AFL-CIO ("Local 24"), an unincorporated labor organization as defined in section 2(5) of the Labor Management Relations Act, 29 U.S.C. § 152(5), as well as an "employee organization," as defined in section 3(4) of ERISA, 29 U.S.C. § 1002(4). Complaint (ECF 1) ¶ 10.

---

Defendants attached four exhibits to their Opposition. These include, *inter alia*, the Sewell Letter of Assent (Exhibit 2).

[4] The facts set forth in this section are undisputed, unless otherwise noted. And, I have viewed the facts in the light most favorable to defendants as the non-moving parties.

MESCO is a Maryland corporation engaged in the electrical contracting and construction business. *See* Mem. Exh. 14 (MESCO Articles of Incorporation).[5] Sewell, also a Maryland corporation engaged in the electrical trade, dissolved on December 28, 2011, shortly before suit was filed in this case. *See* Mem. Exh. 16 (Sewell Articles of Incorporation) and 17 (Sewell Articles of Dissolution). Michael E. Sewell ("Mr. Sewell") was the sole owner and officer of Sewell. Mem. Exh. 18, Deposition of Michael E. Sewell, as representative of Sewell, at 11. Mr. Sewell testified that Sewell typically performed deliveries and other support services for MESCO. *Id.* at 31.

Central to this dispute is a Collective Bargaining Agreement (the "CBA") between Local 24 and the Baltimore Division, National Electrical Contractors Association, Maryland Chapter. *See* Mem. Exh. 3 (CBA) at 1.[6] The CBA states that the jurisdiction covered by the agreement includes Baltimore, Harford, Frederick, Carroll, Howard, and Anne Arundel Counties, as well as Baltimore City and Annapolis. *Id.* at 77. Further, the CBA states that it "shall apply to all firms who sign a Letter of Assent to be bound by the terms of this Agreement." *Id.* at 1 (emphasis in CBA). Both MESCO and Sewell, d/b/a Mr. Electric, signed such letters of assent. *See* Mem. Exh. 2 (MESCO Letter of Assent); Opp. Exh. 2 (Sewell Letter of Assent).

In their Opposition, defendants expressly adopted a portion of the statement of facts found in plaintiffs' Memorandum, pertaining to MESCO's Letter of Assent and its obligations

---

[5] Because both the Articles of Incorporation and defendants' Opposition refer to the company as "MESCO," I will adopt the all-capitalized version of the name, unless quoting documents, such as plaintiffs' briefs, that use "Mesco."

[6] The version of the CBA found in the record was effective from June 1, 2008, through May 31, 2011, and states that it "shall continue in effect from year to year thereafter, from June 1st through May 31st of each year, unless changed or terminated in the way later provided herein." *Id.* § 1.01. The record contains no suggestion that the CBA has been changed or terminated, and defendants raise no challenge to plaintiffs' claims pertaining to contributions that became due after May 31, 2011, on the ground that their obligations pursuant to the CBA have changed at any point in time.

under the CBA to make contributions to plaintiffs. *See* Mem. at 4; Opp. at 4. That portion states, *id.*:

> On December 30, 1998, Mesco signed the Letter of Assent obligating it to adhere to the terms of the CBA negotiated between the Baltimore Division, National Electrical Contractors Association, Maryland Chapter, and Local Union 24, [International Brotherhood of Electrical Workers]. [Mem. Exh. 2 (Mesco Letter of Assent).] The CBA provides for the rates of pay, wages, hours of employment, and other conditions of employment for Mesco's employees covered by the CBA. The CBA specifically provides for the payment of contributions by Mesco to the Health Fund, Pension Fund, Severance Fund, NLMCC and MEILMCC of specified amounts per hour worked by each of Mesco's employees covered by the CBA. [CBA] Articles VI, VII, VIII. In addition, the CBA provides for payment of employee benefit contributions by Mesco to the JATC and the NEBF of specified percentages of gross earnings of Mesco's employees covered by the CBA. [CBA] Article V, Section 5.16 and Article VI, Section 6.01. All such payments are to be made by the 15th day of the month following the month in which the hours were worked, and such payments are to be accompanied by a remittance report showing the hours worked by each covered employee, the gross wages for such employees, and the amounts owed. [Kratz Aff. ¶ 6]; [CBA] Article VI, Sections 6.01, 6.07. The Letter of Assent specifically provides that the signatory employer "agrees to comply with, and be bound by, all of the provisions contained in [the] current and subsequent approved labor agreements." [Mem. Exh. 2]. The CBA further provides for certain authorized deductions to be made from the wages of Mesco's employees. Specifically, union dues are to be deducted from the wages of Mesco's employees and are to be remitted to Local 24. [CBA] Article III, Section 3.07. Remittances to Local 24 are to be made by the 15th day of the month following the month in which the hours were worked, and such remittances are to be accompanied by a remittance report showing the hours worked by each covered employee, and the amounts owed for such hours. [*Id.*] Article VI, Section 6.07.

As defendants readily acknowledge, Sewell and MESCO signed identical Letters of Assent. *See* Opp. at 3 ("Sewell was signatory to the same Letter of Assent that Plaintiffs assert is the source of MESCO's participation in the Local 24 CBA and duty to contribute to the Funds."); Opp. Exh. 2 (Sewell Letter of Assent). Defendants further recognize that, "if there is an obligation on the part of MESCO to contribute to the Funds and/or Local 24 by virtue of its identical Letter of Assent, that same obligation would have existed as to Sewell & Associates." Opp. at 3.

Plaintiffs explain that an auditor working on their behalf performed an audit of MESCO for the months of October 2007 through July 2011 and determined that MESCO owes delinquent employee fringe benefit contributions in the amount of $26,047.42. Mem. Exh. 4 at 4. The auditor also allegedly conducted an audit of MESCO's payroll records, produced in the course of this litigation, and remittance reports submitted by MESCO to plaintiffs for the months of October 2011 through September 2012, and determined that $167,882.56 in unpaid contributions is due to plaintiffs for those months. Mem. Exh. 5 at 4. Further, the auditor conducted an audit of Sewell's payroll records for the months of January 2009 through December 2011, and determined that Sewell owes plaintiffs $199,158.00 in unpaid contributions for that period. Mem. Exh. 6 at 4. In total, plaintiffs seek to recover $393,087.98 in unpaid contributions, jointly and severally.

Additionally, plaintiffs maintain that defendants are jointly and severally liable for $16,028.21 in prejudgment interest owed by MESCO, and for $41,156.19 in prejudgment interest owed by Sewell. Mem. at 41-42. Plaintiffs also claim joint and several entitlements to $18,852.68 in liquidated damages owed by MESCO, and $20,319.73 in liquidated damages owed by Sewell. *Id.* at 42-44. In sum, plaintiffs seek $489,444.79 in delinquent contributions, interest, and liquidated damages, jointly and severally. *Id.* at 44.

In support of their contention that MESCO and Sewell are jointly and severally liable for the damages sought, plaintiffs argue that the two defendants operated as a single employer and/or were alter egos of one another. *See* Mem. at 2, 8-9. To that end, plaintiffs cite numerous exhibits to establish, among other things, that MESCO and Sewell: (1) had multiple, common business locations; (2) had common employees; (3) had numerous common projects, with Sewell periodically paying wages on behalf of MESCO, despite contractual provisions preventing

MESCO from assigning work to others, and with MESCO representing that work performed by employees of Sewell was performed by its own employees; (4) paid employees interchangeably; (5) had common financial ties; and (6) shared the same fax number. Mem. at 9-31.[7]

Additional facts are included in the Discussion.

## II. Discussion

### A.  Summary Judgment Standard

Plaintiffs' Motion is governed by Rule 56 of the Federal Rules of Civil Procedure.  It provides, in part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" establishing a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *accord Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  In other words, the non-moving party must show disputes of material fact so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

[7]  As discussed below, defendants have not contested plaintiffs' claim that the two companies functioned as a single entity.  Accordingly, it is unnecessary to recount in detail the extensive factual record on which plaintiffs rely in support of their arguments as to the relationship between MESCO and Sewell.

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U. S. at 247-48 (emphasis in original).

In resolving a summary judgment motion, the court may not make credibility determinations. *Black & Decker Corp. v. United States*, 436 F. 3d 431, 442 (4th Cir. 2006). Moreover, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. However, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### B. Statutory Background

ERISA provides a "comprehensive and reticulated" statutory framework for the administration and regulation of employee pension plans. *Massachusetts v. Morash*, 490 U.S. 107, 113 (1989). Its regulatory scheme is guided by a specific purpose:

> "[T]o ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in [them] . . . . Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it."

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 607 (1993) (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986)) (alterations in *Concrete Pipe*). Among those pension plans subject to ERISA are "multiemployer

plans," like the Plan Plaintiffs, "to which more than one employer contributes," and which are "maintained to fulfill the terms of collective-bargaining agreements." *Concrete Pipe*, 508 U.S. at 606; *see* 29 U.S.C. § 1301(a)(3) (defining "multiemployer plan").

As amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1132 and 1145 "provide specific remedies for the enforcement of federal pension laws and the collective bargaining and trust agreements executed pursuant to these laws." *Trs. of Glaziers Local 963 v. Walker & Laberge Co.*, 619 F. Supp. 1402, 1403 (D. Md. 1985); *accord Int'l Painters and Allied Trades Indus. Pension Fund v. Libmak Co., LLC*, 2012 WL 5383313, at *4 (D. Md. Oct. 31, 2012) (quoting *Trs. of Glaziers Local 963*); *Nat'l Elec. Ben. Fund v. Rabey Elec. Co.*, 2012 WL 3854932, at *3 (D. Md. Sept. 4, 2012) (same). In particular, section 515 of ERISA, codified at 29 U.S.C. § 1145, provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Further, ERISA section 502(g) states, in relevant part, 29 U.S.C. § 1132(g)(2):

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan --
>
> > (A) the unpaid contributions,
>
> > (B) interest on the unpaid contributions,
>
> > (C) an amount equal to the greater of --
>
> > > (i) interest on the unpaid contributions, or
>
> > > (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

Section 515 allows a multiemployer plan to "enforce, as written, the contribution requirements found in the controlling documents." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997); *see Laborers Health & Welfare Trust Fund for Northern Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 541 (1988); *Int'l Painters and Allied Trades Indus. Pension Fund v. Capital Restoration & Painting Co.*, 919 F. Supp. 2d 680, 686 (D. Md. 2013). Moreover, "section 515 puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles." *Bakery & Confectionery Union*, 118 F.3d at 1021 (noting that, among other things, an employer is not "permitted to raise defenses that relate to claims the employer may have against the union," as opposed to the plan).

In *Nat'l Elec. Ben. Fund*, 2012 WL 3854932, at \*4, the district court set forth standards applicable in an ERISA case to collective bargaining agreements and other agreements regulated by ERISA:

> Federal common law governs the interpretation and enforcement of ERISA-regulated agreements and collective bargaining agreements. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957); *see also United McGill Corp. v. Stinnett*, 154 F.3d 168, 171-72 (4th Cir. 1998) (interpretation of ERISA-regulated plans); *Kefer v. H.K. Porter Co.*, 872 F.2d 60, 62 (4th Cir. 1989) (interpretation of collective bargaining agreements). Courts should interpret ERISA regulated pension plans "under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense." *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995). Similarly, in interpreting the terms of a collective bargaining agreement, courts must "begin by looking at the language of the agreement for any clear manifestation of the parties' intent." *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437, 440 (4th Cir. 2011) (quoting *Keffer*, 872 F.2d at 62).

*Accord Trs. of Heating, Piping & Refrigeration Pension Fund v. Engineering Contractors, Inc.*, 2013 WL 1498912, at *2 (D. Md. Apr. 9, 2013).

C.  Plaintiffs' Motion For Summary Judgment

Plaintiffs have moved for summary judgment against defendants MESCO and Sewell, "as alter ego and/or parallel corporations," and seek damages, jointly and severally, for unpaid contributions, liquidated damages, interests, attorneys' fees, and costs, pursuant to the underlying agreements and 29 U.S.C. § 1132(g).  Mot. at 1.  In defendants' view, material disputes of fact exist as to both liability and damages.  Opp. at 2.

1. MESCO and Sewell as single employer or alter egos

According to plaintiffs, "business records of Mesco and Sewell and Associates show that the companies had interrelated operations, common management, centralized control of labor relations and common ownership such that Sewell and Associates is an alter ego and/or parallel corporation to Mesco."  Mem. at 32.  As noted, plaintiffs devote substantial attention in their opening Memorandum to establishing the connection between defendants.

The alter ego doctrine serves to "'prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making a 'mere technical change in the structure or identity of the employing entity . . . without any substantial change in its ownership or management.'""  *Maryland Elec. Indus. Health Fund v. Kodiak Util. Constr.*, 289 F. Supp. 2d 698, 701-02 (D. Md. 2003) (quoting *Mass. Carpenters Ctr. Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998) (further citation omitted)); *see also Trs. of the Heating, Piping and Refrigeration Pension Fund v. Engineering Contractors, Inc.*, 2011 WL 4711925, at *2 (D. Md. Oct. 4, 2011).  "[T]wo entities are alter egos of one another if there is a disguised continuance of the old employer shown by common ownership, management, business

purpose, operation, equipment, customers, and supervision." *Trs. of Nat. Automatic Sprinkler Indus. Pension Fund v. Budget Plumbing Corp., Inc.*, 111 F. Supp. 2d 716, 719 (D. Md. 2000). Similarly, "[t]wo entities will be considered a single employer by law if they have an interrelation of operations, common management, centralized control of labor relations, and common ownership." *Id.* "The two doctrines are interrelated" in the sense that "'one corporation is the alter ego of another where the factors necessary to support a "single employer" finding are met and . . . the second corporation is a "disguised continuance" of the employing enterprise . . . .'" *Id.* (quoting *Trs. of Pension, Welfare and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788-89 (7th Cir. 1993)) (citations omitted; modifications in *Trs. of Nat. Automatic Sprinkler Indus. Pension Fund*). The paramount question is "whether there is an arm's length relationship between the entities." *Trs. of Nat. Automatic Sprinkler Indus. Pension Fund*, 111 F. Supp. 2d at 720.

In this case, defendants offer no response to counter plaintiffs' contention that MESCO and Sewell are alter egos or a single employer. As plaintiffs observe: "The Defendants have not disputed that the companies operated as alter egos and/or a single employer; neither have they disputed any of the overwhelming factual evidence establishing that the companies operated as alter egos and/or a single employer." Reply at 3; *see also id.* at 4 ("The Defendants do not, however, dispute that the companies operated as alter egos and/or a single employer and owe contributions on that basis."). Because defendants do not challenge that contention, they have conceded that point. *See McKeel v. United States*, 178 F. Supp. 2d 493, 504 (D. Md. 2001) ("Plaintiff appears to concede this point, as he has failed to respond to the government's argument on this point."); *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440 (D. Md. 2001) ( "Plaintiffs appear to concede this point, as they have failed to respond

to this argument."); *cf. Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [a moving party's] argument" in support of a dispositive motion, "the [non-moving party] abandons [that] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (non-moving party's failure to address in opposition brief an argument raised in opening brief constitutes abandonment of claim).

2. Liability

Defendants submit several arguments in response to plaintiffs' assertions as to their liability. Preliminarily, I note that although defendants take the position that neither MESCO nor Sewell has ever been a signatory to a collective bargaining agreement with Local 24, *see* Opp. at 2, they acknowledge that both defendants signed identical Letters of Assent. *See* Opp. at 3 ("Sewell & Associates was signatory to the same Letter of Assent that Plaintiffs assert is the source of MESCO's participation in the Local 24 CBA and duty to contribute to the Funds."); Opp. Exh. 2 (Sewell Letter of Assent). Defendants concede that, "if there is an obligation on the part of MESCO to contribute to the Funds and/or Local 24 by virtue of its identical Letter of Assent, that same obligation would have existed as to Sewell & Associates." Opp. at 3.

In support of their arguments in opposition to plaintiffs' summary judgment motion, defendants invoke various legal theories, including waiver, estoppel, failure to satisfy conditions precedent to litigation, failure to exhaust contractual remedies, "contractual bar based on the arbitration provision," and failure to mitigate damages. Opp. at 7. Conspicuously absent from defendants' Opposition, however, is any authority in support of their claims; the eight-page Opposition does not cite a single case or statutory provision. *See id.* at 1-8.

a.  Failure to exhaust contractual remedies

For one, defendants contend that plaintiffs failed to exhaust contractual remedies required under the CBA.  Opp. at 5.  As defendants observe, the CBA establishes a Labor-Management Committee (the "Committee"), consisting of three union representatives and three employer representatives.  CBA § 1.05.  All disputes between Local 24 and an employer that are not "adjusted" within a 48-hour period must be submitted to the Committee for resolution.  *Id.* at § 1.06.  A dispute that the Committee cannot resolve must be "referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding."  *Id.* at § 1.08.  Further, "[a]ny grievance not brought to the attention of responsible opposite parties to this Agreement in writing within fifteen (15) working days of its occurrence shall be deemed to no longer exist."  *Id.* at § 1.10.  *See also* Opp. at 5.  According to defendants, neither Local 24 nor any of the Plan Plaintiffs initiated grievance procedures as set forth in CBA §§ 1.05-1.08.  *See id.*

In *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364 (1984), the Supreme Court addressed whether the trustees of two multiemployer trust funds were required to arbitrate a dispute with employers over the meaning of a term found in underlying collective bargaining agreements, prior to seeking judicial enforcement.  466 U.S. at 365.  Those collective bargaining agreements between the employers and the relevant union required arbitration of disputes between an employer and the union.  *Id.* at 369-70.  The employers maintained that, as third-party beneficiaries of the collective bargaining agreements, the funds' trustees were "bound by the arbitration clauses provided [in the collective bargaining agreements] to the same extent the Union would be if it were seeking judicial enforcement of those agreements."  *Id.* at 370.

The Supreme Court rejected that argument. As an initial matter, the Court concluded that "the presumption of arbitrability is not a proper rule of construction in determining whether arbitration agreements between the union and the employer apply to disputes between trustees and employers, even if those disputes raise questions of interpretation under the collective-bargaining agreements." *Id.* at 372. Turning to the terms of the relevant trust and collective bargaining agreements, the Court concluded that those agreements evidenced "no intent on the part of the parties to require arbitration of disputes between the trustees and the employers." *See id.* at 372-73; *see also, e.g.*, *Cent. States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 575 (1985) ("The notion that federal policy favors union enforcement of an employer's collectively bargained obligations to a benefit plan, to the exclusion of enforcement by the plan's trustees, simply did not survive [*Schneider*].").

Here, as in *Schneider*, it is necessary to assess the terms of the underlying agreements to determine whether the claims asserted by plaintiffs must be submitted to arbitration. Importantly, the CBA is an agreement between Local 24 and the relevant chapter of the National Electrical Contractors Association, Inc., as well as all employers who are bound to the CBA through a Letter of Assent. *See* CBA at 1. Likewise, in the dispute resolution provisions set forth in §§ 1.05-1.08, the CBA refers in several instances to the obligations of "the parties." *See id.* § 1.06 ("All grievances or questions in dispute shall be adjusted by the duly authorized representatives of *each of the parties to this Agreement*") (emphasis added) and § 1.10 ("Any grievance not brought to the attention of *responsible opposite parties to this Agreement* . . . shall be deemed to no longer exist.") (emphasis added). Accordingly, the CBA's dispute resolution provisions indicate that, as in *Schneider*, the union, Local 24, is bound by those requirements.

Because of the dispute resolution procedure found in the CBA, it is apparent that summary judgment for Local 24 is unwarranted.[8]

As for the Plan Plaintiffs, however, there is no indication in the CBA that those entities are permitted, much less required, to invoke the dispute resolution procedure found in §§ 1.05-1.08. The CBA provisions relating to the seven Plan Plaintiffs offer further confirmation that the Plan Plaintiffs are not bound to the CBA dispute resolution process. *See* CBA §§ 5.01 (JATC); 6.01 (NEBF); 6.02 (Health Fund); 6.03 (Pension Fund); 6.04 (Severance Fund); 7.01 (NLMCC); and 8.01 (MEILMCC). One such provision, governing the NEBF, expressly states that unpaid contributions "may be recovered *by suit* initiated by the NEBF or its assignee." CBA § 6.01 (emphasis added).[9] Several other provisions state: "If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take *whatever steps are necessary* to secure compliance." *See* CBA §§ 7.04, 8.04 (emphasis added). Critically, neither these provisions nor those applicable to the other Plan Plaintiffs contain any suggestion that the trustees are required to arbitrate—either through the process outlined in CBA §§ 1.05-1.08 or otherwise—a dispute with an employer regarding contributions. As such, the claims of the Plan Plaintiffs are properly before this Court, and the CBA's dispute resolution provisions pose no barrier to summary judgment in their favor.

---

[8] The only motions pending before the court are plaintiffs' Motion to Strike and Plaintiffs' Motion for Summary Judgment; defendants have not moved to dismiss the claims of Local 24 or sought to compel arbitration of its claims. At this stage, then, I will simply deny Plaintiffs' Motion For Summary Judgment as to Local 24's claims.

[9] Although the provisions applicable to several other benefit plans do not expressly address a right to bring suit, they state that an employer's "[f]ailure to make these payments shall carry the same penalty as failure to comply with Article VI, Section 6.01 of the Agreement." *See* CBA §§ 6.02 (Health Fund), 6.03 (Pension Fund), and 6.04 (Severance Fund).

b. Failure to mitigate

To the extent defendants argue that a failure by plaintiffs to mitigate any losses poses a barrier to summary judgment as to liability, that argument suffers from several flaws. *See* Opp. at 6-7.[10]  As an initial matter, defendants have cited no case in which a court has endorsed a failure-to-mitigate defense in the context of an ERISA claim involving unpaid employer contributions.  Indeed, several courts have either cast doubt on the applicability of a failure-to-mitigate defense in the ERISA context or rejected its application to the facts presented.  *See, e.g.*, *Iron Workers' Local No. 25 Pension Fund v. Klassic Services, Inc.*, 913 F. Supp. 541, 546 (E.D. Mich. 1996) (acknowledging possible applicability of mitigation but denying defendant's motion to amended affirmative defenses to add mitigation, where defendant did not allege how plaintiffs "could have avoided the accumulation of damages"); *see also Schleibaum v. Kmart Corp.*, 153 F.3d 496 (7th Cir. 1998) ("Whether plaintiffs are even required to mitigate their damages in the ERISA context is not a settled matter of law." ); *Bd. of Trs. of Plumbers, Pipefitters & Mech. Equipment Service, Local Union No. 392 Pension Fund v. GM Mech., Inc.*, 2013 WL 6385734, at *3 (S. D. Ohio Dec. 6, 2013) (finding no duty to mitigate); *Carpenters' Dist. Council of Greater St. Louis and Vicinity v. Commercial Woodworking & Contracting, Inc.*, 2012 WL

_____

[10] The mitigation of damages doctrine is defined as "[t]he principle requiring a plaintiff, after an injury or breach of contract, to use ordinary care to alleviate the effects of the injury or breach.  If the defendant can show that the plaintiff failed to mitigate damages, the plaintiff's recovery may be reduced."  Black's Law Dictionary (9th ed. 2009).  *See also, e.g.*, *Beyond Systems, Inc. v. Kraft Foods, Inc.*, --- F. Supp. 2d ----, 2013 WL 4086964, at *17 n.16 (D. Md. Aug. 12, 2013) ("The mitigation doctrine bars recovery to plaintiffs who idly sit by and knowingly allow their damages to accumulate while doing nothing to avoid them."); *Barrie School v. Patch*, 401 Md. 497, 513, 933 A.2d 382, 391 (2007) ("We have recognized generally that, when one party breaches a contract, the other party is required by the avoidable consequences rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defending party only with such damages as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.") (citations and quotation marks omitted); *Cave v. Elliott*, 190 Md. App. 65, 96, 988 A.2d 1, 19 (2010) (quoting Black's Law Dictionary definition).

1025203, at *6 (E.D. Mo. Mar. 26, 2012) ("*Commercial Woodworking*") (same); *In re Beacon Associates Litigation*, 2011 WL 3586129, at *5 (S.D.N.Y. Aug. 11, 2011) ("While there is some case law that suggests failure to mitigate would be unavailable as a defense in an ERISA action, the issue is not settled."). In the event the doctrine of mitigation applies in the ERISA context, "it is an affirmative defense on which Defendants bear the burden of proof." *See Bd. of Trs. of Plumbers*, 2013 WL 6385734, at *3-4 (concluding that, on record presented, defendants failed to meet burden of showing a failure to mitigate by plaintiffs); *Commercial Woodworking*, 2012 WL 1025203, at *6 (defendant failed to meet burden of showing a failure to mitigate).

Even assuming that a failure to mitigate argument is applicable in the ERISA context and, specifically, to a contribution claim of the sort raised here, defendants plainly have not shown how any failure to mitigate would preclude summary judgment for plaintiffs as to liability. For one, to the extent other courts have recognized the possibility of a mitigation defense in the ERISA context, they have indicated that a failure to mitigate argument would apply at most to the determination of damages, and not to liability. *See, e.g.*, *Womack v. Orchids Paper Products Co. 401(K) Sav. Plan*, 769 F. Supp. 2d 1322, 1336 (N.D. Okla. 2011); *Central Laborers' Pension Fund Bd. of Trs. v. Mike Fasula Concrete Const., Inc.*, 2011 WL 6338904, at *5 (N.D. Ill. Dec. 19, 2011). Here, defendants all but admit as much, arguing that mitigation could have limited the alleged injury "before it bec[ame] dramatic," and would have allowed plaintiffs "to stem the losses from non-payment[.]" *See* Opp. at 6.

Moreover, defendants fail to establish that plaintiffs had a duty to pursue any of the avenues for mitigation they identify, which include withdrawing union representatives from work, terminating the CBA, and requesting a bond to ensure payment. *See id.* The CBA contains no suggestion that these mechanisms are a prerequisite to filing suit. Rather, the CBA

provisions pertaining to bond requests and to the withdrawal and strike remedies indicate that a decision to take those actions lies within the discretion of the trustees and Local 24. *See* CBA § 6.06 and CBA § 6.07.

In particular, CBA § 6.06 provides (emphasis added): "*At the sole discretion of the Trustees of each of the aforesaid Funds*, or at the *sole discretion of the Union*, any Employer may be required to deposit [a certified check, cash, or bond of up to $5,000] in order to assure compliance with the provisions of this Article." Likewise, CBA § 6.07 states (emphasis added): "[I]n the event the Employer fails to make any of the [employee benefit] payments required . . . , the Union *shall have the right* to withdraw the employees of said Employer and may strike said Employer . . . ."[11] Of import here, the strike and withdrawal rights found in CBA § 6.07 are expressly reserved for "the Union" and not the fund trustees. In any event, rather than resorting to those CBA remedies, which the Plan Plaintiffs were not obligated to pursue, the Plan Plaintiffs brought statutory claims pursuant 29 U.S.C. § 1132(a)(2). Defendants have identified no barrier preventing them from doing so.

Nor is it evident that the Plan Plaintiffs should have been aware of delinquent contributions, particularly those owed by Sewell. Defendants argue that, during the time when Sewell allegedly worked on the same projects as MESCO, using common employees, Local 24 was represented by an on-site "shop steward," pursuant to the CBA. Opp. at 3 (citing CBA § 2.12(a)). However, as plaintiffs note, a shop steward's function is "to make every effort to maintain harmony on the job or in the shop by resolving any grievances and the steward shall be given sufficient time to see that this Agreement, safety conditions, and the protection of electrical

---

[11] It would be undesirable to *require* a disruptive measure such as a strike or a termination of a collective bargaining agreement. Indeed, courts have endorsed a presumption of arbitrability for union-employer disputes precisely to avoid such outcomes. *See Schneider*, 466 U.S. at 372.

jurisdiction are enforced on the job." *Id.* Moreover, defendants offer nothing that casts doubt on plaintiffs' assertion that they were unaware that Sewell continued to operate in any capacity after 2005, or that it did so in conjunction with MESCO. *See* Reply at 2-3.

In short, defendants fail to show any duty to mitigate in this context, or that plaintiffs breached such a duty. The speculation that defendants offer falls well short of generating a genuine issue of material fact that would preclude summary judgment. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice" to create a genuine issue of material fact.); *see also Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (affirming grant of summary judgment because plaintiff's "conclusory statements, without specific evidentiary support," were insufficient to create a genuine issue of fact).

c.  Waiver of claim to contributions owed by Sewell

For similar reasons, defendants' argument invoking principles of waiver is also unavailing. Notably, defendants plainly have not raised a statute of limitations argument.[12] Instead, defendants argue, *inter alia*, that by failing to assert any claims against Sewell prior to its dissolution, plaintiffs have waived their right to do so. Opp. at 2 (arguing plaintiffs fail to explain why they "never sought to collect unpaid benefits from Sewell while that company still existed"). Defendants cite no authority in support of their waiver argument. Just as defendants'

_____

[12] Plaintiffs note that the Complaint, filed on February 17, 2012, seeks contributions owed by Sewell for the period of January 2009 (which, plaintiffs say, became due in February 2009) through November 2011. *See* ECF 1. According to plaintiffs, the Complaint therefore seeks only "amounts collectible within the relevant statute of limitations." Reply at 4. To that end, plaintiffs cite *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir. 1992) (because ERISA provides no statute of limitations for private actions other than for claims alleging a breach of fiduciary duty, "the court must look to state law and apply an analogous limitation provision"), as well as Md. Code (2006 Repl. Vol., 2012 Supp.), Cts. & Jud. Proc. § 5-101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."). In any event, defendants have not invoked a statute of limitations defense.

speculation as to plaintiffs' knowledge cannot sustain a failure-to-mitigate claim, defendants have not established that such awareness existed or that it can sustain a defense of waiver.

<u>d.  No duty to pay benefits</u>

Defendants also maintain that they have no duty to contribute to the Plan Plaintiffs, due to a provision found in both the MESCO and Sewell letters of assent.  Opp. at 7; *see* Mem. Exh. 2 (MESCO Letter of Assent); Opp. Exh. 2 (Sewell Letter of Assent).  The letters state, *id.*:

> In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

According to defendants, because neither MESCO nor Sewell has ever belonged to the National Electrical Contractors Association, summary judgment must be denied.  Opp. at 7.

The plain language of the provision that defendants invoke is contrary to their interpretation.  The provision expressly pertains to contributions paid to the "National Electrical Industry Fund."  Mem. Exh. 2; Opp. Exh. 2.  However, the "National Electrical Industry Fund" is not a plaintiff.

Further, defendants present no argument explaining how the contributions sought by any of the actual plaintiffs are foreclosed by this provision.  Significantly, the CBA contains a separate article addressing contributions to the National Electrical Industry Fund, which makes no mention of any connection between that fund and any plaintiff here.  *See* CBA Article IX.

Like defendants' other arguments, this claim does nothing to preclude summary judgment as to liability in favor of the Plan Plaintiffs.

## 3. Damages

Regarding damages, defendants make the generalized assertion that "[n]umerous issues exist with respect to Plaintiffs' alleged 'audit' and their calculations of the amounts owed." Opp. at 7. However, defendants articulate only two arguments in support of their opposition to plaintiffs' requested damages. *See id.* at 7-8. Both are unavailing.

### a. Union membership and scope of contribution obligation

In an argument confined to two sentences of their Opposition, defendants assert that plaintiffs "offer no evidence that the employees they aver to be members of Local 24 are indeed members of the Local," and that nine individuals—Joseph Russo, Bryan Young, Brad Young, Michael Fisher, William Miller, Rossario Cavallaro, Vincent Brunner, Gregory Diehl, and Sean McClintock—were not members of Local 24. Opp. at 7.[13] Defendants make no reference to any underlying agreements, nor do they cite any authority in support of the conclusion that they apparently advance: that they were not required to make contributions on behalf of these and other non-unionized workers. *See id.*

Plaintiffs do not argue that any of the nine individuals identified by defendants were Local 24 members. *See* Reply at 8. As plaintiffs correctly note, union membership does not determine the scope of an employer's obligation to make benefit fund contributions. Rather, the relevant question is "which employees and jobs are covered by the contract that gives rise to" the contribution obligations at issue. *See Laborers' Dist. Council Health and Welfare Trust Fund No. 2 v. Comet Contracting, LLC,* 2006 WL 2085847, at *7 (D. Md. July 25, 2006).

Defendants have not raised any contentions beyond pointing out the non-union status of nine individuals; their argument goes no further. Even if they had made such an effort, however,

---

[13] Plaintiffs indicate that although the name "Sean McClintock" is absent from the payroll records of either defendant, an employee named "Shawn McClintic" does appear. According to plaintiffs, those individuals are one and the same. *See* Reply at 8 n.1.

the underlying agreements do not support a claim that employers' contribution obligations are confined only to union members.

*Nat'l Elec. Ben. Fund.*, *supra*, 2012 WL 3854932, is instructive. In that case, the district court addressed claims brought against a defendant employer ("Rabey"), to recover ERISA contributions that the plaintiff fund alleged it was owed. *See id.* at *2-3. As in the present case, Rabey was bound by the terms of a collective bargaining agreement with a local union of the International Brotherhood of Electrical Workers, under which Rabey was obligated to make contributions on behalf of electrical employees. *Id.* at *1. In opposing the plaintiff's summary judgment motion, Rabey argued, among other things, that the relevant trust agreement and collective bargaining agreement were ambiguous as to whether a temporary employee qualified as a covered employee, for whom Rabey was required to make benefit contributions. *See id.* at *5. However, upon examining the relevant agreements—which contained multiple provisions similar to those at issue in the present case—the district court found no ambiguity and concluded that all electrical workers who performed covered work, whether temporary or permanent, unionized or non-unionized, were covered employees for purposes of Rabey's fund contributions. *See id.*

Here, as in *Nat'l Elec. Ben. Fund*, the CBA's wage classifications draw distinctions based on the type of work performed, but do not differentiate unionized from non-unionized workers. CBA § 3.05; *see Nat'l Elec. Ben. Fund*, 2012 WL 3854932, at *5 ("The [collective bargaining agreement's] Classification List sets wages based on the type of work performed, but makes no distinction between unionized and non-unionized employees or between 'temporary employees' and permanent employees."). More generally, nowhere in Article III—which governs hours,

wage payment, and working conditions—does the CBA distinguish between unionized and non-unionized workers.

Moreover, the letters of assent binding defendants to the CBA established that the local union will serve as the bargaining agent "for *all employees* performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites." Mem. Exh. 2 (MESCO Letter of Assent); Opp. Exh. 2 (Sewell Letter of Assent); *see Nat'l Elec. Ben. Fund*, 2012 WL 3854932, at *5 (quoting identical language). Notably, other courts have construed underlying agreements as covering all employees, and not merely unionized employees, where those agreements contained provisions similar to those found here and in *Nat'l Elec. Ben. Fund*. *See, e.g.*, *Clark v. Ryan*, 818 F.2d 1102, 1105 (4th Cir. 1987) (no ambiguity where relevant agreements were based on type of work performed rather than status of union membership); *Teamster's Local 348 v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir. 1984) ("The presence in the agreement of a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members."); *Manning v. Wiscombe*, 498 F.2d 1311, 1312-13 (10th Cir. 1974) (finding no ambiguities and concluding that contributions were required for both union and non-union employees).

### b. Failure to mitigate

As noted, defendants raise the failure-to-mitigate issue in connection with liability, but do not mention it again in the context of damages. *See* Opp. at 7-8. As explained at length, *supra*, defendants have not established a duty to mitigate in the circumstances presented here. Moreover, defendants have plainly failed to establish how the Plan Plaintiffs breached a duty to

mitigate and to what extent plaintiffs' damages could be reduced based upon that purported failure.

### c. Offset

Defendants also argue that, to the extent liability is found, the amount of damages due to plaintiffs should be offset by $39,200, which, defendants say, is owed to them by Local 24 pursuant to a "target fund agreement" regarding the "Levindale project." Opp. at 7-8. Notably, defendants have not brought a counterclaim or otherwise explained how the amount purportedly owed to them by Local 24 is a proper offset. *See, e.g., CapitalSource Finance, LLC v. Delco Oil, Inc.*, 2010 WL 3733934, at *6 (D. Md. Sept. 20, 2010) ("As Defendants have not filed any counterclaims, moreover, there is no possibility of offset.").

In any event, I need not reach that argument, as it applies only "to the extent there was any liability to Local 24." At this stage, that determination has not been made. *See* Opp. at 8; *see also Bakery & Confectionery Union*, *supra*, 118 F.3d at 1021 (noting that employer may not assert, as to a benefit plan, "defenses that relate to claims the employer may have against the union").

### d. Damages to Plan Plaintiffs

The remaining questions pertain to the apportionment of liability between the defendants, and the amount due to the Plan Plaintiffs. Regarding the first issue, courts have concluded that defendant employers found to be alter egos of one another or to otherwise constitute a single employer may be held jointly and severally liable for unpaid ERISA contributions. *See Trs. of Nat. Automatic Sprinkler Indus. Pension Fund*, *supra*, 111 F. Supp. 2d at 719 (two companies constituting a single employer are "jointly and severally liable for delinquent [employee benefit fund] contributions"); *accord Laborers' Dist. Council Health and Welfare Trust Fund No. 2*,

2006 WL 2085847, at *7-11 (defendants jointly and severally liable for unpaid contributions, liquidated damages, and interest); *see also Vance v. NLRB*, 71 F.3d 486 (4th Cir. 1995) (affirming an NLRB determination that two companies constituting a single employer were jointly liable for damages resulting from unfair labor practices).

Where a benefit fund has conducted an audit and no other barriers to liability or damages exist, judgment is appropriate, absent some specific challenge to the audit's findings. As the court explained in *Nat'l Elec. Ben. Fund*, 2012 WL 3854932, at *4: "Neither the Fourth Circuit nor its district courts have addressed the specific standard of review for a summary judgment motion where an employer that is required to contribute to a multiemployer pension plan challenges the plan's audit findings." Nevertheless, "other courts have held that judgment as a matter of law is appropriate where the plan presents an audit demonstrating that contributions are owed and the employer fails to identify specific errors in the audit or provide documentation to rebut the audit's conclusions." *Id.* (citing *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695-97 (6th Cir. 1994); *Trs. of Plumbers & Steamfitters Local Union No. 43 v. Crawford*, 573 F. Supp. 2d 1023, 1036-38 (E.D. Tenn. 2008); *Durso v. Cappy's Food Emporium, Ltd.*, 2006 WL 3725546, at *1-2 (E.D.N.Y. Dec. 14, 2006)).

Here, defendants offer no such challenge to the amounts claimed by plaintiffs. Moreover, plaintiffs have submitted three audit reports detailing the sums allegedly owed by defendants to plaintiffs. Under those circumstances, summary judgment for the Plan Plaintiffs is warranted. *See Nat'l Elec. Ben. Fund*, 2012 WL 3854932, at *4 (stating that the defendant employer "has identified no specific factual errors and has presented no documentary evidence that would contradict the revised audit report's conclusions or [the plaintiff fund's] damages claims"; because the defendant "has therefore failed to establish a genuine issue of material fact,

[plaintiff] is entitled to summary judgment"); *Trs. of Plumbers & Steamfitters Local Union No. 43*, 573 F. Supp. 2d at 1036-38 (granting summary judgment to fund where employer "point[ed] to no specific errors and offer[ed] no documentary evidence to rebut the auditor's determinations"); *Durso*, 2006 WL 3725546, at *1-2 (granting summary judgment to fund where the employer "ma[de] no substantive argument as to the accuracy of the audit").

As noted, the ERISA provision found at 29 U.S.C. § 1132(g)(2) allows, *inter alia*, for the recovery of "unpaid contributions," "interest on the unpaid contributions," and an additional amount equal to either (a) "the interest on the unpaid contributions" or "liquidated damages" of up to 20 percent. In connection with their summary judgment motion, plaintiffs outline in detail the basis for the amounts sought within each of these categories. *See* Mem. at 38-44.

### i. Unpaid contributions

Regarding the unpaid contributions, the eight plaintiffs seek amounts of $193,929.98 (in connection with the contributions owed by MESCO) and $199,158.00 (in connection with the contributions owed by Sewell), for a total of $393,087.98. *See* Mem. 42-44.[14] A total of $31,271.31 ($13,647.27 associated with MESCO[15] and $17,624.04 associated with Sewell)

---

[14] Although the total figure of $199,158.00 is consistent with the amount specified in the underlying audit report, the Memorandum appears to contain a typographical error in the amount sought by the Severance Fund. Based on the audit report, as well as the total amount requested in the Memorandum, it is apparent that the amount sought by the Severance Fund is $33,377.83, *see* Mem. Exh. 6 at 4, not the amount of $33,337.83, as stated in the Memorandum. *See id.* at 39.

[15] In the Memorandum, plaintiffs request $14,595.71 in unpaid contributions owed to Local 24, based, they say, on two audits of MESCO covering the periods of October 2007 - July 2011 and October 2011 - September 2012. Mem. at 39 (seeking $14,595.71 and citing Mem. Exh. 4 at 4 and Mem. Exh. 5 at 4). However, the actual audit reports reflect unpaid dues totaling $13,647.27, based on $1,588.63 in unpaid contributions dating from October 2007 - July 2011, *see* Mem. Exh. 4 at 4, and $12,058.64 in unpaid contributions dating from October 2011 - September 2012. *See* Mem. Exh. 5 at 4. Moreover, the total amount of unpaid contributions alleged in the Memorandum—$193,929.98—is accurate only when the corrected amount for

relates to Local 24's claims. Therefore, I will deduct that amount and award the Plan Plaintiffs the remainder: $361,816.67. The apportionment of that amount among the seven Plan Plaintiffs is reflected in the accompanying Order.

### ii. Interest

The eight plaintiffs also seek interest in the amounts of $16,028.21 (in connection with contributions owed by MESCO) and $41,156.19 (in connection with contributions owed by Sewell), for a total of $57,184.40. *See* Mem. at 41-42. A total of $4,557.50 ($1,088.66 associated with MESCO and $3,468.84 associated with Sewell) relates to Local 24's claims. Therefore, I will deduct that amount and award the Plan Plaintiffs the remainder: $52,626.90. The apportionment of that amount among the seven Plan Plaintiffs is reflected in the accompanying Order.

### iii. Liquidated damages

The Plan Plaintiffs seek liquidated damages in the amounts of $18,852.68 (in connection with the contributions owed by MESCO) and $20,319.73 (in connection with the contributions owed by Sewell), for a total of $39,172.41. *See* Mem. 42-44. Because none of that total is attributable to Local 24's claims, the Plan Plaintiffs are due that sum in full.[16] The apportionment of that amount among the seven Plan Plaintiffs is reflected in the accompanying Order.

---

Local 24 ($13,647.27) is used. *See* Mem. at 39. *See also id.* at 44 (reflecting total of $489,444.79, which is consistent with amounts reflected in underlying audit reports).

[16] Although plaintiffs also seek attorneys' fees and costs, *see* Mem. at 7-8, they identify no particular amounts sought. Accordingly, I will defer ruling on the request for attorneys' fees until plaintiffs submit adequate and detailed information, along with authority in support of their particular requests.

## D.  Plaintiffs' Motion to Strike

As noted, plaintiffs filed a Motion to Strike (ECF 34) in connection with the deposition testimony of James W. Conkel, Jr.  Defendants oppose the Motion to Strike.  *See* ECF 36.

On January 17, 2013, plaintiffs deposed Mr. Conkel.  *See* ECF 34-2, Deposition of James W. Conkel, Jr., Jan. 17, 2013.  Mr. Conkel testified that he worked at MESCO for approximately 10 years, with the title of vice-president, and also worked for Sewell during 2011 and 2012.  *See id.* at 11-14.  During his deposition, Mr. Conkel was asked whether he had been an officer of MESCO, and he responded: "Yes."  *Id.* at 14.  Subsequently, on February 18, 2013, Mr. Conkel completed an errata sheet for his deposition, in which he revised his answer of "Yes" to "By title only."  *See* ECF 34-3 at 1 (errata sheet).  The errata sheet did not supply a reason for the change. Upon further inquiry, Mr. Conkel explained in a handwritten addition to the errata sheet:  "The reason for this change is I misspoke by saying I was an officer of the company, only by title was I considered an[] officer of MESCO."  *Id.*

In connection with the Motion to Strike, plaintiffs "request that the material change to Mr. Conkel's testimony be stricken."  ECF 34-1 at 5.  And, they ask the Court to direct Mr. Conkel "to amend his errata sheet to remove the material change."

Fed. R. Civ. P. 30(e)(1), which governs depositions, provides:

Review by the Witness; Changes.

(1) Review; Statement of Changes.  On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Rule 30(e)(1) thus permits "changes to deposition testimony in 'form or substance' if the changes are made within 30 days of notification that the transcript is available and accompanied by the reasons for making them." *Wyeth v. Lupin Ltd.*, 252 F.R.D. 295, 296 (D. Md. 2008) (Gauvey, M.J.). Nevertheless, courts have differed in the latitude granted to deponents seeking to alter their testimony. To my knowledge, the Fourth Circuit has not squarely addressed the issue.

Some courts have allowed deponents who adhere to the procedural requirements of Rule 30(e) to change the substance of their deposition testimony. *Wyeth*, 252 F.R.D. at 296 (citing *Foutz v. Town of Vinton, Virginia*, 211 F.R.D. 293, 295 (W.D. Va. 2002)). Other courts "interpret the rule as foreclosing changes that materially alter the testimony or contradict the testimony." *Wyeth*, 252 F.R.D. at 296; *see Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 WL 2724882, at *5 (D. Del. Sept. 22, 2006) ("The errata sheet 'clarifications' in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade."). *See also Rios v. Bigler*, 847 F. Supp. 1538, 1546-47 (D. Kan. 1994); *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D. La. 1992). Recent decisions in this Court have adhered to the latter approach. *See Harden v. Wicomico Cnty.*, 263 F.R.D. 304, 308-09 (D. Md. 2009) (Grimm, M.J.); *Wyeth*, 252 F.R.D. at 296.[17]

---

[17] Beyond Fed. R. Civ. P. 30(e), other rules exist that limit efforts to effectively revise a witness's prior deposition testimony, particularly where an inadequate basis for an inconsistency is offered. Most notably, the "sham affidavit rule" holds that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (adopting sham affidavit rule).

Here, the testimony at issue in the Motion to Strike is, according to plaintiffs, "relevant to the common supervisory and managerial control between Mesco and Sewell and Associates." ECF 34-1 at 4. However, at this stage defendants do not challenge plaintiffs' argument that MESCO and Sewell functioned as a single employer or as alter egos of one another. Therefore, the dispute over the change made by Mr. Conkel is effectively moot. Accordingly, I will deny plaintiffs' Motion to Strike.

### III. Conclusion

For the foregoing reasons, plaintiffs' Motion For Summary Judgment (ECF 35) is granted in part and denied in part. And, plaintiffs' Motion To Strike The Material Change To Deposition Testimony Of James W. Conkel, Jr. (ECF 34) is denied, as moot. A separate Order follows, consistent with this Memorandum Opinion.


Date: February 28, 2014                    _____/s/_____
                                           Ellen Lipton Hollander
                                           United States District Judge